## EMPIRE STATE PHOSPHATE CO. v. HELLER et al.

(Circuit Court of Appeals, Second Circuit. April 19, 1894.)

### No. 79.

1. SALE—INTERPRETATION OF CONTRACT—DESCRIPTION OF GOODS.

A contract for sale of "high grade kiln-dried" phosphate rock of a quality particularly described, provided that, whenever the seller should accumulate a certain quantity thereof, "of the proper quality to deliver under this contract," the same should be taken by the buyer within a specified time after notice. *Held,* that a tender of such rock not kiln-dried, with an offer to have it kiln-dried before removal, was not a tender of a proper delivery under the contract.

2. PAROL EVIDENCE—CONVERSATIONS PRIOR TO CONTRACT.

A written contract for sale of kiln-dried phosphate rock provided that, whenever the seller should accumulate a certain quantity thereof of the proper quality to deliver. the same should be taken by the buyer within 30 days after notice of the seller's readiness to make delivery. *Held,* that prior conversations between the parties were not admissible to show that the rock might be kiln-dried after notice of readiness to deliver, or that the buyer was not to have full 30 days to take kiln-dried rock.

In Error to the Circuit Court of the United States for the Southern District of New York.

This was an action by the Empire State Phosphate Company against James E. Heller and Adolph Hirsh for damages for breach of contract. A verdict was directed for defendants, and judgment was entered thereon. Plaintiff brought error.

Henry B. Closson and Edward M. Shepard, for plaintiff in error.

John S. Davenport (Felix Jellenik, on the brief), for defendants in error.

Before LACOMBE and SHIPMAN, Circuit, Judges.

LACOMBE, Circuit Judge. This is an action brought by the plaintiff corporation to recover damages sustained by reason of an alleged breach by the defendants of a contract for the purchase from the plaintiff of a quantity of phosphate rock. The contract was in writing, and bears date March 26, 1891. By it the plaintiff sells to the defendants exclusively—

"The entire output of the phosphate mine owned by it, situated in Citrus county, Florida, for the term of one year beginning thirty days after the completion of the S. S. O. & G. R. R. to the Florida Rock Phosphate Co.'s mines, aggregating not to exceed 25,000 tons of their high-grade, kiln-dried land phosphate, at the price of 17½ cents per unit of bone phosphate of lime, on dry basis per ton of 2,240 lbs., f. o. b. cars at mines."

The contract next provides that the rock is to contain 75 per cent. bone phosphate of lime, with elaborate provisions as to testing, analysis, amount of oxides it may contain, etc.,—clauses which it is not material to recite here. Then follows:

"Delivery. Whenever party of the first part has accumulated not less than 1,500 tons of phosphate of the proper quality to deliver under this contract, the same shall be taken by the party of the second part, at the stated price, f. o. b. the cars at seller's mines, within 30 days after party of the first part has notified party of the second part of its readiness to make delivery."

Further provisions cover the contingency of the party of the second part being "unable to remove such lot of 1,500 tons within said 30 days;" but, as the evidence does not show the happening of that contingency, they need not be quoted. The railroad having been completed, the plaintiff proceeded to mine the phosphate, and, having accumulated a sufficient quantity, notified defendants by letter dated May 29, 1891, that they were prepared to make delivery of $1,500 tons under the contract on June 1st. This tender was renewed by letter on July 28, and again on August 11, 1891. In this last-mentioned letter, which is the first one referred to in appellant's brief as a tender of the phosphate, plaintiff says that it had mined in pursuance of the contract—

"Upwards of 1,500 tons of phosphate rock, the same conforming in all respects to the provisions of the said contract; that the said phosphate rock is now ready for delivery, pursuant to the terms of said contract; that the same will be delivered to you, pursuant to such terms, on the 17th instant, and that you are requested, prior to the said 17th instant, to begin removal of said rock phosphate."

This letter concludes as follows:

"The rock phosphate will, as provided by the contract, be kiln-dried, and, as you have requested, and unless you otherwise request, such kiln-drying will freshly take place immediately prior to each removal of the phosphate, so as to prevent, to the utmost, as you have requested, the absorption of moisture from the atmosphere and the consequent damage. If you desire any other course followed, please advise us at once."

Defendants objected to taking the rock by letters dated July 11th and July 30th, questioning whether it had all been mined subsequent to 30 days after the completion of the railroad, and asking for a statement of the daily output of plaintiff's mine since such

completion.' These objections they renewed in a letter of August 12th, in answer to plaintiff's letter last above quoted, adding the following:

"We do not agree with you on the other point you mention, namely, that we had made a request of you about drying, such as you state. The nearest approach to it was a mere suggestion from us to the effect that you ought to have the rock under cover after it has been kiln-dried, so that it should not be exposed to rain. You thereupon informed us that you had covers provided for every pile, to protect it against rain."

Further correspondence ensued, which it is not necessary to quote, defendants declining to accept, and questioning whether the rock tendered was of the quality required; plaintiff insisting upon its acceptance, and threatening sale on buyers' account. During all this time it is conceded that the rock mined, accumulated, and tendered was not kiln-dried. Finally, on November 18th, plaintiff notified defendants that they would adjourn the auction sale to December 3d, and "renewed the tender of the 1,500 tons of phosphate rock last tendered you, and notify you that we shall begin delivery of the same according to the terms of the contract on the 23d inst. * * * The rock will be kiln-dried." On November 23d all the rock had been kiln-dried, and defendants were so notified, and requested to begin removal at once; and on December 2d plaintiff notified defendants that the sale of the rock on buyers' account, for failure to accept under the contract, was adjourned until December 10th. By that day defendants had not removed it, and plaintiff sold the same at a considerable loss, and brought this action, averring that by reason of defendants' breach of contract it lost the sale of its output for the year, which it alleges would have amounted to 10,500 tons, and claiming damages for upwards of $90,-000.

From the above statement of the facts it will be noted that plaintiff tendered no kiln-dried phosphate to defendants until November 23, 1891, and that, so far from giving the defendants 30 days to remove the kiln-dried rock then tendered, it disposed of it by sale at auction 17 days after its tender. For these reasons defendants insisted upon the trial that breach of contract on their part had not been shown, and the circuit judge, being of that opinion directed a verdict in favor of defendants.

Error is assigned to the refusal of the circuit judge to admit certain proof offered by the plaintiff, which, it is claimed, would have tended to show that it was "a bad thing to have phosphate, after it is kiln-dried, remain in the open air." Also to the refusal to admit proof that at an interview between one of the defendants and a representative of the plaintiff, had prior to the signing of the contract, defendant requested the plaintiff to kiln-dry the phosphate as nearly as was possible simultaneously with the removal of the phosphate by defendant. The rule is well settled that negotiations, suggestions, and discussions between the parties antecedent to the execution of a written contract are merged in the contract, and that evidence is inadmissible to vary the terms which, after

negotiation, the parties have settled upon and adopted as expressing their final agreement. Undoubtedly there are exceptions to this rule where the language of the contract is ambiguous or susceptible of more than one interpretation, or where extrinsic evidence is necessary to enable the court to properly define some particular word or phrase, or where it shows some independent agreement, not covered by the written contract, nor inconsistent with it. In the case at bar, however, the written contract is wholly free from any ambiguity as to the quality of phosphate to be delivered. It must be "high grade, kiln-dried land phosphate" of the character more particularly described therein. That is the quality of phosphate which was sold and bought, and with which alone the contract is concerned. No phosphate which was not kiln-dried would be a proper delivery under the contract. No tender of phosphate not kiln-dried would be a tender of "phosphate of the proper quality to deliver under the contract." Any evidence of prior conversations which would tend to show that the phosphate might be delivered without kiln-drying would contradict the express terms of an unambiguous subsequent written contract. The plaintiff relies upon defendants' alleged failure to take under the delivery clause above quoted, but that clause expressly gave the buyers 30 days to take "phosphate of the proper quality to deliver under the contract." If the evidence of prior conversations tended to show that defendants were not to have full 30 days to take such phosphate, it would contradict another express and unambiguous provision of the subsequent written contract. In either event, it was properly excluded, and, if it did not go to the extent of contradicting the written contract in one or other of those particulars, it was immaterial and inadmissible, the vital points in issue being whether plaintiff had tendered the phosphate it had agreed to deliver, and had given defendants the time stipulated in the contract for its removal.

There was no error in the direction of a verdict for defendant, as the undisputed proof shows that no phosphate was kiln-dried until November 23d, and that it was sold by plaintiff before the 30 days had elapsed to which, under the contract, the defendants were entitled for its removal.

Judgment affirmed.